**P.F. MANLEY, Plaintiff-Appellant,**

v.

**PLASTI–LINE, INC., A Tennessee Corporation, Defendant-Appellee.**

No. 86–1063.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 6, 1986.

Decided Jan. 5, 1987.

David Barnett (argued), Barnett, Knight, Falvay, Drolet & Freeman, Bloomfield Hills, Mich., for plaintiff-appellant.

Carl H. VanEnde, Miller, Canfield, Paddock & Stone, Birmingham, Mich., Gary W. Faria (argued), Miller, Canfield, Paddock & Stone, Bloomfield Hills, Mich., for defendant-appellee.

Before KENNEDY and MILBURN, Circuit Judges; and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Plaintiff-Appellant P.F. Manley (plaintiff) appeals an order of the United States District Court for the Eastern District of Michigan which denied plaintiff's summary judgment motion and granted a summary judgment motion of Defendant-Appellee Plasti-Line, Inc. (Plasti-Line) in a diversity action over the amount of compensation that Plasti-Line contractually owes to the plaintiff. Because questions of fact involving the parties' contractual intent exist, we affirm the district court's denial of the plaintiff's summary judgment motion, re-

verse its summary disposal of the case and remand for further proceedings.

Plaintiff, having retired after spending fourteen years as the Financial Control Manager of the Dealership Identification Program at Ford Motor Company, contacted Plasti-Line in August of 1980 and suggested that his experience at Ford would be of great use to prospective bidders, such as Plasti-Line, in obtaining contracts for the installation and maintenance of signs for Ford dealerships around the country. Plasti-Line agreed and the two parties subsequently entered into a written letter agreement (consultant agreement) on October 10, 1980 for plaintiff's consultant services. Under this agreement, Plasti-Line was obligated to pay plaintiff $1,000 per month for six months in return for his efforts to secure a major Ford sign contract that was expected to be awarded by March 31, 1981. In addition, the parties agreed that the plaintiff would receive a commission of ¾ of one percent on "[b]usiness covered under the contract [between Plasti-Line and Ford] contemplated by March 31, 1981...."

In March of 1981, Plasti-Line indeed obtained, with plaintiff's assistance, the Ford contract.[1] The present dispute has arisen over the amount of commission that the plaintiff should consequently receive under the commission clause in the consultant agreement. Plaintiff argues that the "contract contemplated by March 31, 1981" included extensions or renewals of the original Ford contract and thus his compensation under the commission clause should be calculated on a three-year period since the length of the Ford contract was, he contends, three years (two years with extensions totalling an extra year). Plasti-Line, on the other hand, argues that the commission clause did not encompass such subsequent contractual arrangements and the compensation to which the plaintiff was

entitled was therefore limited to commission based on only a two-year period, the term of the initial Ford contract.[2]

Plasti-Line stresses that although it continued to do business with Ford for one year after the two-year Ford contract had terminated, such business was *not* part of the Ford contract that plaintiff helped secure, but the result of its own negotiations, and thus plaintiff has no right to claim a commission from such business.

On September 11, 1984, plaintiff filed a complaint in district court alleging breach of the agreement between him and Plasti-Line and seeking $21,145.00 as "unpaid commission." The district court referred the matter to a magistrate who issued his Report and Recommendation on October 11, 1985. Two months before such issuance, both parties filed motions for summary judgment.

The magistrate determined that, under the commission clause ("[b]usiness covered under the contract contemplated by March 31, 1981"), the plaintiff was entitled to compensation based on only two years since the "contract contemplated by March 31, 1981" was a two-year contract expiring on March 19, 1983. The inconsistent price terms, the magistrate explained, in the initial Ford contract and the subsequent agreements between Ford and Plasti-Line also indicated that the latter agreements were separate contracts and not mere extensions of the initial contract. The magistrate discounted the use of words such as "extension" and "amendment" in the contracts executed by Ford and Plasti-Line after March 19, 1983 as "inartful drafting." In addition, the magistrate emphasized the plaintiff's knowledge that the typical length of contracts such as the Ford contract is two years, notwithstanding the plaintiff's testimony that such contracts could and sometimes do run for more than

---

**1.** The contract was actually in the form of a "Blanket Purchase Order" executed by Ford and Plasti-Line.

**2.** In contending that the Ford contract was restricted to a two-year duration, Plasti-Line relies

on one of the terms of the contract which provides:

> Work shall be done in accordance with Buyer's release authorizations from March 20, 1981 to March 19, 1983 for which the Seller's quoted prices shall remain firm.

two years upon renegotiation of the price terms. The magistrate then recommended that the plaintiff's motion for summary judgment be denied and Plasti-Line's motion for the same be granted.

After a hearing before the district court regarding the plaintiff's objections to the magistrate's report, the court, on December 13, 1985, entered an order adopting and approving the magistrate's Report and Recommendation.

■ Simply stated, we believe that pivotal factual issues in the present case exist and thus the dispute cannot be properly resolved through summary disposition. Fed.R.Civ.P. 56(c) provides in part that summary judgment is appropriate when "there is no genuine issue as to any material fact. . . ." *See United States v. Articles of Device Consisting of Three Devices . . . "Diapulse"*, 527 F.2d 1008, 1011 (6th Cir. 1976) (no determination of factual issues by summary judgment). In contract actions, summary judgment may be proper when the documents in question are undisputed and "reveal that there is no question as to intent." 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2730.1 at 279–80 (2d ed. 1983). However, disputed questions of contractual intent are considered factual issues which are precluded from summary resolution.[3] *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 910 (6th Cir.1982); *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1128–29 (6th Cir.1981), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). *See*

*generally Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.*, 608 F.2d 1106, 1109 (6th Cir.1979) (Under Michigan law, the court's "primary task in construing a contract is to give effect to the parties' intention."); *Moulton v. Lobdell-Emery Manufacturing Co.*, 322 Mich. 307, 310, 33 N.W.2d 804, 806 (1948) (parties' intent is critical in interpreting contract).

■ In the present case, the parties, in supporting their motions, and the magistrate, in resolving the dispute, looked beyond the express language of the consultant agreement, thus relying on parol evidence, principally the plaintiff's deposition testimony, to vindicate their interpretations of the commission clause.[4] This reliance is patently incongruous with the district court's grant of summary judgment. These ventures outside the document to interpret the commission clause poignantly illustrate that the intended scope of the clause is ambiguous and warrants a factual inquiry.[5] *See Heheman*, 661 F.2d at 1128 (Interpretation of ambiguous language is "a factual issue turning on the intent of the parties.")

■ We agree with the magistrate that it is the reasonable expectation of the parties that should be given effect. As the magistrate stated: "If plaintiff's meaning is to prevail, it would have to be shown that plaintiff neither knew nor had reason to know of a different meaning attached to that language by defendant and that defendant knew or had reason to know of plaintiff's meaning."[6] After reviewing the

---

**3.** The fact that both parties filed motions for summary judgment is of no import. *See Davis v. Chevy Chase Financial Ltd.*, 667 F.2d 160, 170 (D.C.Cir.1981), *citing* 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.13 at 56–341 (2d ed. [1986] ).

**4.** We agree with the implicit position of the magistrate and the district court that the commission clause in the consultant agreement was not so unambiguous as to preclude admission of parol evidence.

**5.** Of course, summary judgment would have been appropriate had the parol evidence indicated only one reasonable and intended meaning of the contractual language, but that is not the case in the present dispute.

**6.** The magistrate made this statement after referring to Restatement (Second) of Contracts § 201(2) (1979) which provides:

Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made (a) that party did not know any different meaning attached by the other, and the other knew the meaning attached by the first party; or (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

The magistrate then notes that although Michigan had not officially adopted this Restate-

consultant agreement and the parol evidence, we disagree with the magistrate's conclusion that, without dispute, the plaintiff knew or had reason to know Plasti-Line's interpretation of the commission clause and Plasti-Line did not know and had no reason to know the plaintiff's view of the intended scope of the clause.

Plaintiff relies in part on the noncompetition clause in the consultant agreement to substantiate his claim that there was no contractual intent to restrict his commission to orders received by Plasti-Line during the two-year period of the original Ford contract.[7] The plaintiff argues that the noncompetition clause prohibited any competitive activities on his part until Plasti-Line's last commission payment to him.[8] The plaintiff further argues that it was contemplated that he would be receiving commissions long after the two years had expired because of the time lag between performance by Plasti-Line and payment by Ford and also because purchase orders received by Plasti-Line before the two years had expired would be filled over a considerable time thereafter. If, argues plaintiff, he was not entitled to commissions on purchase orders received by Plasti-Line after the two-year period had expired, he would be bound not to seek the Ford business for a competitor of Plasti-Line and earn commissions for a long time during which Plasti-Line could obtain the business and not pay him a commission. This, plaintiff argues, would be patently unfair and not intended by the parties.

Further, plaintiff testified by deposition that contracts similar to the original Ford contract are often extended beyond the first two-year period upon renegotiation of the price terms. In fact, a vice president of Plasti-Line tacitly recognized the possibility of such extensions amid statements made in an affidavit.

We also note that Plasti-Line's interpretation of the commission clause appears at least questionable for another reason. Plasti-Line asserts that the plaintiff's entitlement to commission is limited to "the contract contemplated by March 31, 1981," that is, is limited to commissions derived from payments made as a result of a contract entered into before that date. However, let us suppose that, only a few months into the initial two-year period of this Ford contract, Ford and Plasti-Line had executed a superceding agreement and continued their business relationship. Plasti-Line's interpretation would arguably lead to the result that plaintiff's right to commissions would terminate with the execution of the new contract. The blatant unfairness of such a result at least throws doubt on the position of Plasti-Line and the interpretation by the magistrate.

Lastly, we point out that plaintiff's right to the commissions sued for is not determined solely by whether, under Michigan law, the arrangements effective after March 19, 1983 were "extensions" of the original contract or were "new" contracts. Cf. Nib Foods, Inc. v. Mally, 70 Mich.App. 553, 560, 246 N.W.2d 317, 321 (1976) (latter arrangements, in which material provisions differed from that of the original contract, may constitute new, separate contracts). This is only a factor to be considered in determining the actual contractual intent of the parties.

Because factual issues in this dispute exist, summary judgment was inappropriate. We therefore reverse the district court's order and remand the case for further proceedings not inconsistent with this opinion.

---

ment, section 201 is a logical extension of the reasoning already employed by the state courts.

7. The noncompetition clause provides: "During the term of our association, Mr. Manley will not represent any other sign company."

8. We note that the plaintiff, in drawing these inferences from the language of the noncompetition clause, raises another factual issue to be explored at trial.